May it please the court, Venetia Carpenter-Asui, for Plaintiff Robert Fahl. My brief is pretty comprehensive. I'd prefer to answer questions if that would be alright. Well, I thought the briefing is good in this case and it's kind of laid out on the law. I guess the one question is, what is the evidence of pretext? That's where I kind of got stuck, to be honest. It seems like an unfortunate situation how this all worked out, but I really was kind of hard-pressed to find the pretext. Maybe you can enlighten me. Yes, Your Honor. There was testimony, deposition testimony submitted by plaintiff's two supervisors, Shinsato and Marita. And these are the primary people we're alleging discriminant against my client. And they each testified in their depositions, and it's attached, that they themselves did make some of the discriminatory statements, that they heard some of the discriminatory statements made by plaintiff's co-workers. Let me ask you, tell us, are these the people that could make the decision to phase out the whole, in effect, Honolulu office and transfer the work to San Diego? Yes, Your Honor. In fact, the department head, Marita, testified in her deposition that he selected Mr. Fahl for RIF and decided to... For what? Reduction in force, and he brought this to Captain Shams, who actually just signed off on it. But it was Marita, the person we're alleging committed the discrimination, who selected Mr. Fahl out of 99 employees in the department who are all Japanese, Mr. Fahl being the only Caucasian 70-year-old person, other than one other Caucasian male who's also blind, who's still there, and selected him for this RIF process. But the evidence of pretext we have are the admissions by Shinzato and Marita in their depositions, that they heard these discriminatory statements, that they received Mr. Fahl's written complaints of discrimination, that they received Mr. Fahl's written complaints of discrimination. In addition, Mr. Fahl at the same time filed in Module 1 that revised retirement policy, poking fun at older employees on his desk. They decreased his workload despite 82 all-in-all military construction projects in an era, and as you can see from Mr. Fahl's credentials, he performed huge jobs on hotels, banks. I mean, he did the interior design for huge complexes. None of these military construction projects were too big for his expertise. He was denied reclassification from General Arts and Information in 1001 to Interior Design in 1008, which would have allowed him to transfer to another job. There were numerous memos on Airbot 401 from all of the big heads of interior design talking about the importance of it from the inception of the construction process until the process was actually post-completion. So he was an integral part of any kind of military construction project. All of the disputed facts were construed by the district court in favor of the moving party, and that was improper. The defendant argued that interior design has decreased down to two employees, and that's not true. Mr. Fahl's testimony is that there were half two interior designs at Pactive since he began working there in 1974. I must not understand that correctly. There were always two. He was one of the two. Yes, Your Honor. Were there two after he was laid off? No. There are not. But that's also not part of Plaintiff's prima facie case in the RIF case, and the defendant acknowledges that in two places in their brief. And in the RIF case, Plaintiff does not have to prove that he was replaced by a younger person who was performing his duties. Was he replaced by anybody? We don't know, Your Honor. So really, just to understand, really, in terms of having made the decision about the RIF arrangement, you really rely on the Morita deposition primarily? Yes, we have testified that he selected Mr. Fahl for the RIF and went to Shands, and Shands normally signed the paperwork. And so what's the pretext? The pretext is that Morita, who is his supervisor, second-line supervisor, and Shinsato, both admitted that they called him Old Fart, Old Goat, Old Dinosaur, Old Harold. There's a laundry list of all the names that they've all acknowledged calling him, and here are him being called in the workplace, Old Dinosaur. You name it, he was called that. Furthermore, we have the EER investigative report, where the EER investigator wrote that Shinsato and Morita said it was merely ribbing and joking. And Mr. Fahl loved it. He enjoyed it. He liked being called those names, which is absolutely false. All right. Thank you. Thank you. May it please the Court, Michael Burke from the United States. I'd like to address a couple of the questions the Court raised earlier, if it pleases the Court. The Court asked, you know, where is the pretext? I think there are several key facts, clearly on the record, which do support the District Court's finding that there was no pretext. First, we know that Mr. Morita, the director of the design division, and that's not just interior design, that encompasses all the planners and architects and so on, the entire division, that Mr. Morita spoke to two employees, not just Mr. Fahl, about this SIP, or S-I-P, this chance for a bonus to retire at that point. Mr. Fahl and a Junette Higashihara, who is of Japanese descent. So there were two people approached, one Haole, one of Japanese descent. So this suggestion that somehow only the Haole guy was singled out isn't true on the record at all. Second, while plaintiff likes to stand here and tell you that Mr. Morita and Mr. Shinsato were really pulling the strings, and that Captain Christopher Shantz was a mere puppet, there's no evidence of that. The District Court looked at the decision maker, especially in the context of the retaliation claim, and found that Captain Shantz had made the decision, he was the decision maker, he made the decision to turn down the activity here locally and go to the consolidation in San Diego as a question of downsizing. And so there's no suggestion that he was a rubber stamp at all. Next, I think it's an important factual note to see that Mr. Morita did not request or initiate SIP availability. This was in the context of a larger program going on. The Navy says then you can utilize SIP if you have a need for it. He didn't call someone up and say, hey, send me over some SIP and SAB bonuses, I want to use them. Next, in fact, I think it's very important for this Court to realize, and I think the District Court did note that Mr. Fahl's fellow worker of the two workers, Mrs. Niwa, left in March of 2000, and her position was never refilled ever. So those two positions, the one besides Mr. Fahl's, was never refilled after she left at that time. Next, I'd like to point out that there was a switch, as we all know in this record, of the interior design work to San Diego, the Southwest Division, where they had five-some interior decorators. There was only one small design job, Your Honors. One job, I think it had to do with just getting some furniture for Japan. Ever since the time of Mr. Fahl's leaving his job until these briefs were written, at least, never ever did this local office even have any work for Southwest. This is entirely consistent with the evidence the District Court looked at that said there were diminishing requirements for work here in Hawaii. And this is borne out by the fact that we couldn't even give anything to Southwest when they took over the consolidated role. I think that's an important fact. I think it's certainly very, very consistent with this overall claim that there was going to be a general downsizing and consolidation because of less work. Today, I think also it's important to note that the Southwest Division remains the interior design expertise center for this area, for the region including Hawaii. That has never changed from the time that was changed back in 2001. I think the second most important fact here, Your Honors, that supports the District Court's decision is perhaps one that the District Court did not focus on enough that I've been presenting this case at that point. And that is Mr. Morita stated under oath that, and I'll quote, since 1997 the Design Division has reduced almost half of its employees in budget reductions. In 1987, the division employed up to 137 people as compared to its staff of 69 employees in July of 2001. Again, the Design Division isn't just interior design, that's that entire division that includes the architects, the planners, the draftspeople, and so on, all dealing with construction projects. They, since 1987 to 2001, were cut in half. This shows, I think beyond a doubt, that there indeed was this trend that the more immediate supervisors and Captain Schwartz talked about where there was an incredible amount of downsizing and less and less and less work over a period of time. Who made that decision or those decisions over a period of time? I do not know whether that decision was made locally or at a higher level. I do know that Mr. Morita stated that his entire division was cut in half during that period of time. But I can't tell you how high up that decision making did go. But it's certainly consistent with their testimony that they were finding less and less projects, period, not talking about just interior design projects. And by the way, there's some claim, I think, in the plaintiff's brief that the work was shuffled off to independent contractors and this was this way of showing there was no work or proving there was no work. But there's absolutely nothing in their record to suggest there was anything new about giving big projects or certain projects to contractors outside of our system. Apparently it was a longstanding process that continues today. I think especially today where all this outsourcing has become the thing around the country. Another fact that I think completely supports the district court's decision here, the workload was declining over a number of years and it started in the 90s and went down from there. And while plaintiff claims the district court could not possibly rely on the two people who said that because plaintiff had accused those two people, nevertheless those people were under oath and were good sources of information regarding whether or not the workload had declined. And again, this prior fact I've been discussing shows the workload for the entire division had declined so radically they had to cut their workforce in half. Next, I think it's important to note the record reflects Mr. Fahl himself knew about the possible consolidation even before Mr. Shinsato did. That was in the late 90s. Mr. Shinsato testified. I didn't go tell him about this possible downsizing and consolidation in San Diego. He told me because he was working with that office. That office over the 90s was indeed becoming more and more the center of expertise, the center of power for interior design input into projects that were applicable. And I think it's very telling that Mr. Shinsato learned of this from Mr. Fahl because I think that proves this wasn't some phony story or pretext ginned up in a back room to get rid of Mr. Fahl, but a long ongoing discussion of consolidation of power in San Diego. Lastly, and I think most importantly certainly, the district court noted, and I think this is the most telling thing here, this is sort of where's the beef in this kind of case where we have a riff. The district court noted that no one was ever hired to replace plaintiff. And no employee ever assumed plaintiff's duties. And the interior design department was actually eliminated and remains eliminated. This is really the beef. This is really the evidence of whether there was pretext here or real consolidation and downsizing causing first the SIP offer and eventually the riff. I think I've covered who made the decision to phase out the office. That was Captain Shantz. Again, the district court mentioned that regarding retaliation, he knew absolutely nothing of these EEO complaints or discussions between Mr. Fahl and anyone else when he made this rift decision. And I don't think it's an accurate reflection of the record, and I don't know this record as well as Plaintiff's Counsel perhaps since I was assigned this case later, but I do not believe it's accurate to say that the two main individuals involved in the direct supervision of Mr. Fahl, that is Mr. Clyde Marita and Mr. Herbert Shinsato, actually admitted that they had called this individual racist names. I don't think that's in there. Perhaps you could point to where she finds them calling him a racist name. And certainly calling someone or addressing someone as a haole or a sage, I don't think by anyone's claim could automatically be assumed to be at all racist. Certainly in Hawaii it is not. I would submit racist without more. And we have very consequential proof from a fellow worker who was very friendly with Mr. Fahl. Mr. Fahl gave him a very beautiful and rare gift from Japan on his retirement that there was a constant banter throughout the years in the office with Mr. Fahl taking an active part in enjoying this as much as the next guy, including calling his fellow workers of Japanese descent nippers and so on. Let me go back to your statement about haole doesn't denote anything derogatory in Hawaii. I don't know if it does or not. I'm not from Hawaii. But the district court indicated that it can carry a derogatory connotation. Do you disagree with that? Absolutely not. I think that's the whole point. That it's not simple enough to say if you refer to someone as a haole, that's derogatory. That's not true. And that's what this court should hopefully recognize. The district court was careful to separate out. There can be contextual language. There can be circumstances where calling someone a haole in the context of the sentence, tone of voice, the conversation could be deemed derogatory. But it's not automatically derogatory. Just like plaintiff claims they called him the sage, meaning apparently wise man. Well, he claims he took offense to that or that was an offensive comment on his age. But most people wouldn't automatically assume addressing another person of whatever age as a sage would be considered derogatory. We'd have to look at contextual conversations and so on. But the real point here, your honor, is not whether or not this banter occurred. I think it's in the fabric of the state of Hawaii, the people of Hawaii, when they get together in workplaces. I don't think it's rare. I don't think it's uncommon. It happens in every workplace I've ever been in. That's not really the point here. I think we'd have to see a lot more. For example, we'd have to see that Mr. Fall went and complained about this stuff and nothing was done. But in truth, the record reflects, Ms. Merida said, over time when Mr. Fall would complain about this or that, he would remind the workers to be sensitive in the workplace. This is an appropriate action to take given these circumstances. So the management met its requirement under Title VII if he was suing just for that, and certainly there's no indication that anyone turned a deaf ear or actually participated in his plaintiff's counsel claims in attacking him on the basis of race whatsoever. We have testimony that several times the opposite happened when the supervisor counseled the other workers to be more sensitive, and they did have periodic training, I believe. That same record shows. But the more important issue is when we're talking about race discrimination here and whether that has any contact, any connection with the RIF. We still have to look for that connection. And that's what the district court said. She assumes that those comments were made, and she's willing to assume he found them offensive. Then she looked to see whether or not there was any tie-up between the people who said this and decision-making in the RIF. The answer was no. She looked to see whether or not there was independent evidence that the RIF was going to happen or whether or not it seemed to be tied up to these racial comments and so on. And again, the answer was no. There's not one shred, not one iota, not one scintilla, as the courts like to say, that there's a connection between this banter in the office space and the eventual decision, which was a juggernaut over time, shrinking the office space here because of lack of projects and so on. And I'd like to remind the court of one last thing. The district court marched through these four or five points. On page 20 of our brief, we start talking about this stuff. I think there were four points that plaintiffs showed the court, saying, look, here is my evidence I'm relying on. The 1993 memorandum from Steve Gong, indicating there's a lot going on. The court pointed out how old that was. Those projects were so old that you could hardly claim that was evidence that in 2000, 2001, that same kind of stuff was going on. The court looked at contract notices regarding various construction projects. And the court diligently marched through those projects, looking at them, and found that the plaintiff had not been reliable with her. The plaintiff had not provided the court with anything that's very vague, self-serving references to these contracts. But when the government came back and was specific with these contracts before the district court and said, look, let me break this down for you, Your Honor. Some of these contracts did not call for any interior design at all. Others were so large, interior design would never be involved. And that's the level of specific proof we gave the court, and the court had a chance to observe and did observe and consider in coming up with her ruling as she marched through these poor claims of evidence. I have the next one, a series of e-mails while they ---- We are over your time now. Thank you, Your Honor. Thank you. Thank you. Your Honors, if I could just address some of the points that Mr. Burkus made. It's very important to note that Colonel Shands was told by Mr. Morita, who testified clearly in his deposition, that he took this idea to rip Mr. Fall out of 99 employees in the design division to Captain Shands, explain to him why he wanted him ripped, and Captain Shands merely signed the paperwork. They make a lot out of the fact that Captain Shands didn't call him an old goat, an old dinosaur. That's true. Captain Shands didn't retaliate against him. That's true. Mr. Fall never met Captain Shands. He doesn't even know who the man is. The man is in charge of the whole PACTIF. He signed off on the paperwork that Mr. Morita, the discriminating supervisor, gave to him. Mr. Burke also mentioned Junetta, who she accepted as if she retired. She was 60-something years old. That doesn't prove that Mr. Fall was not discriminated against based on his age. Ms. Neva, who left the GS-9 interior design position, that's Mr. Fall's wife. She retired because they were receiving no assignments, and she took another job. So Mr. Fall was singled out and treated differently than everyone else in the workplace. There was no detailed evidence presented regarding the 82 military construction projects that Mr. Fall presented to the district court. There was simply a follow-up declaration by Mr. Morita saying, no, no, that's too big for Mr. Fall to handle, and some of those don't require interior design. The only evidence that there was any downsizing or any reduction in work came from Mr. Morita's declarations. There was not one memo, not one letter. That's evidence, isn't it? Well, that's the only evidence. That is the person we're accusing of the discrimination who says, no, there's downsizing. There was also – That's not a response. You have to provide evidence in response. There is evidence. The evidence may not be believed, but you can't say she shouldn't have believed it and stopped there. I'm not saying she shouldn't have believed it. I'm saying that we also submitted about 10 memorandums from the interior design heads, all talking about the importance of the implementation of interior design throughout the entire project. That doesn't tell me anything. I tried to go through those, and I don't see anything. Interior design is important. Great. Is it being done here? Apparently not. On one level, I have a hard time believing that this enormous downsizing of the operation here is all a pretext to get rid of one employee. It just doesn't follow. Your Honor, there was no enormous downsizing. There were 99 employees in July 01, and we submitted the names and positions and the position numbers of those 99 employees. There were not 60 employees, as Mr. Burke represented. That's one of our exhibits. There were 99 Japanese employees, and Mr. Shinsato and Mr. Morita all testified that they were Japanese, except for Mr. Paul and one other blind Caucasian man. Well, I just sat here flipping through the deposition. I know that's not true, so you can make the assertion, but he identified other ethnic backgrounds, too. He just ran through the list. As far as Southwest Division handling the Hawaii interior design project, Southwest Division has always been the head for interior design in the country, so that's nothing new. That's nothing that occurred because Mr. Paul no longer works at PACTIV. Let me refer you specifically to what I just said. I was looking at his depositions starting on page 70, and it appears that you asked him to go through a list of people that worked in his division and identify what you described as their race, I'd say ethnic background, and it's clearly true that there appears to be a ponderance of people of Japanese ancestry, but there are also people identified as being Filipino-Hawaiian, Caucasian, Pacific Island, and you ask what that's about, maybe Filipino, Caucasian, Chinese. So you tell me that there are 99 people and they're all Japanese. I don't see that supported here. I don't have that record in front of me, but basically they were all Asian, which would include Chinese, Japanese, Korean, Filipino, Hawaiian, Pacific Islander. They were not Caucasian. There's a couple people he guessed Caucasian. Newton, I believe, Caucasian. Miller, Caucasian. Now those were the servicemen, not the civilian employees. If you look further in the deposition, we go back and talk about the ones he identified as Caucasian, and they're identified as actual servicemen that are performing some type of office work there for them. These are not civilian employees. And when you look at the word stage, you have to take that in context with the rest of the discriminatory statements, like you're an old dinosaur, you're an old fart. Those, you know, just if you take out the word stage by its spell, sure, that's fine. But if you add it to the other comments that were admittedly made, and then you're told by Marita and Shinsato that that's just ribbing and joking and Mr. Fall loved it, the court felt that it was just ribbing and joking in the workplace. And just because he bought someone a fishing pole when he retired doesn't mean he liked being called those names. Any other questions? I think there's no further questions. Thank you. Thank you. The case Fall v. England is now submitted, and we will adjourn. Thank you, counsel, for your argument.
judges: Bright, McKeown, Clifton